UNITED STATES DISTRICT COURT          <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

---

FARID POPAL,

                              Petitioner,                    MEMORANDUM
                                                             <u>AND ORDER</u>
          - versus -                                         15-CV-1167 (JG)

SUPERINTENDENT, Wende Correctional
Facility,

                              Respondent.

---

A P P E A R A N C E S :

          JONATHAN ISIDOR EDELSTEIN
                    271 Madison Avenue, 20th Floor
                    New York, NY 10016
                    *Attorney for Petitioner*

          RICHARD A. BROWN
                    District Attorney, Queens County
                    125-01 Queens Boulevard
                    Kew Gardens, NY 11415
          By:       Daniel Stephen Bresnahan
                    *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

          Farid Popal petitions under 28 U.S.C. § 2254 for a writ of habeas corpus. Popal is presently incarcerated and serving an aggregate indeterminate sentence of 26 and one-third years to life pursuant to New York state criminal convictions following trial for second-degree murder, tampering with evidence, and conspiracy. He argues that he was denied federal constitutional rights before, during, and after trial. I heard oral argument on the motion on August 21, 2015. For the reasons given below, Popal's petition is denied.

On April 4, 2006, following a jury trial, Farid Popal was convicted of one count of second-degree murder, two counts of tampering with physical evidence, and one count of conspiracy in the fifth degree. He was found guilty of the November 12, 1999 murder of Samiya Haqiqi, Popal's ex-girlfriend. On May 9, 2006, Popal was sentenced to an indeterminate prison term of twenty-five years to life on the murder count, one and one-third to four years on each tampering count, and one year on the conspiracy count. The latter three sentences were imposed concurrently with each other but consecutive to the sentence on the murder count. He is currently incarcerated pursuant to this conviction. Bresnahan Aff. ¶¶ 4, 7.

A.     *The Government's Case*

1.     *Popal and Haqiqi's Relationship*

Haqiqi's mother, Najiba Haqiqi ("Najiba"), testified at trial that Popal began dating Haqiqi in the summer of 1999, while Haqiqi was living with her parents in Queens. T. 936-40, 976. Haqiqi was also dating another man named Shafi at that time. T. 937, 1425. Haqiqi and Popal usually saw each other on Fridays, and the two were often accompanied by a chaperone, in accordance with Afghani custom. T. 977. Yesenia Angione, Haqiqi's best friend, accompanied Popal and Haqiqi on their first date in July 1999. She and Haqiqi met Popal in the Grand Union parking lot. During the date, Angione felt "uncomfortable" because Popal "got really close" to Haqiqi during the meal, and "kept speaking to" Haqiqi in a "native" language that Yesenia did not understand. Haqiqi asked Angione to serve as a chaperone again on subsequent dates, but Yesenia refused. T. 1421-24.

On subsequent dates, Haqiqi's younger cousin, Asiya Azizi, served as a chaperone – Azizi accompanied Haqiqi and Popal "approximately ten times." T. 225, 250. On these dates, she and Haqiqi would drive to the Grand Union parking lot where they would park

Haqiqi's car and meet Popal. T. 225-27. Najiba was aware that Azizi was accompanying Popal and Haqiqi in this capacity, and said that the reason Azizi was accompanying the pair was because Haqiqi "wanted to get to know [Popal]" before being alone with him. T. 976-77. Azizi said the reason she accompanied Popal and Haqiqi on their dates was because Haqiqi "didn't want to be alone with [Popal]." T. 229.

At one point during the summer, Popal and a number of his family members from California went to Najiba's home so that Popal could propose to Haqiqi. T. 223, 937. This type of meeting would precede an arranged marriage in the Afghan community. The marriage proposal was not accepted. T. 224.

In August 1999, Haqiqi moved to Connecticut in order to attend law school at Quinnipiac University. T. 302, 936. At law school, Haqiqi met Andrea Gatti, and the two became friends. T. 303. Gatti testified that Haqiqi used to speak with her about Popal and Shafi. T. 304. She also said that Haqiqi at times felt "uncomfortable around [Popal]," because he "wanted more from the relationship than she wanted." T. 317-18. On Wednesday, November 10, 1999, Haqiqi confided in Gatti that she no longer wanted to see Popal and was going to tell him that during a planned date on Friday, November 12. T. 304-05.

On October 30, 1999, Haqiqi went on a date with Popal that Azizi chaperoned. They met at the Grand Union parking lot and got into Popal's car. After dinner, Popal gave Haqiqi a heart pendant necklace on a gold chain. Haqiqi later told Azizi and Angione that she did not like the necklace, but that she would hang it on the rearview mirror of her car when she went to meet Popal on a date. Azizi felt uncomfortable after the October 30 date and told Haqiqi she did not want to accompany her on more dates with Popal. T. 228-30, 1428.

On Thursday, November 11, Haqiqi told Najiba that she would come home that weekend if Najiba would cook Haqiqi's favorite food, which Najiba agreed to do. T. 940. On

Friday, November 12, Haqiqi called Gatti to cancel their plans to spend time together, because Haqiqi was going to head to Queens directly. T. 308. The two planned to meet on Saturday instead, but Gatti testified that the Friday phone call was the last contact she ever had with Haqiqi. *Id.*

### 2. *Dr. Nick's Transmission*

Popal's brother, Farhad "Frank" Popal ("Frank"), was working at Dr. Nick's Transmission, a car transmission repair shop, on November 12, 1999, along with Joe Miata and Seymour Morrison. T. 376-77, 1020. Miata was an owner of Dr. Nick's. T. 1014. Popal himself had worked at Dr. Nick's in the past, and continued to serve as a consultant for the shop. T. 369-74, 1015-18, 1024-25. Morrison also worked at Dr. Nick's at the time and was hired based on Popal's recommendation. T. 1018-19. Miata and Popal were very close, and both Miata and Morrison described the relationship between Miata and Popal as like "father and son." T. 370-71, 1015-16. Miata hired Frank to work at Dr. Nick's after Popal left the shop for another job. T. 1017-18.

Around 7:30 p.m. on November 12, 1999, Miata answered a call from Popal while working at Dr. Nick's. T. 1020-21. Miata felt that Popal sounded extremely nervous, and was "speaking in a way that he never spoke before." Popal asked to speak to Frank. T. 1021-22. Miata gave the phone to Frank, who spoke to Popal for "about five to seven minutes." T. 1022. Frank was not speaking to Popal in English, but Miata could hear "[Frank] screaming out Haqiqi, Haqiqi, Haqiqi." *Id.* Morrison also testified that the call was "[i]n another language," and that "there [was] a name inside the conversation, Haqiqi." He said Frank "called [the name out] twice . . . in a loud voice." T. 377-78. Morrison felt that the call lasted roughly ten or fifteen minutes and afterwards, Frank was "really, really upset." *Id.* Morrison and Miata had met

Haqiqi once, and Popal had told Miata that he and Haqiqi were "going to get married." T. 1019. Morrison testified that Popal had introduced Haqiqi to him as his wife. T. 375.

Sometime after the phone call, Morrison left work and went to a diner across the street from Dr. Nick's, from which he could still see Dr. Nick's. Morrison left his car in the shop at Dr. Nick's so that he could work on it the next morning. T. 381-82. Miata remained with Frank inside Dr. Nick's after the phone call, during which time Frank acted "very nervously" and asked Miata when he would be leaving work four or five times. Frank told Miata that Popal was having a problem with their father's car, and he asked to remain late in the shop so that he and Popal could fix it. Miata said that this was fine. After that, Miata left for the night. T. 1023-24.

Roughly twenty minutes after Morrison got to the diner, he observed his car being pulled out from its place in the shop and then parked outside, while another car was swapped in. T. 382-83. Morrison went back to Dr. Nick's, and he saw Popal and Frank going into the shop. Morrison thought Frank and Popal looked scared. Morrison asked Popal what was wrong, and Popal told Morrison that he and his father had just gotten into a fight, and that Popal "almost kill[ed] him." Morrison told Popal to call him at home if he needed anything and then left. T. 384-85.

On Saturday, November 13, 1999, Morrison received a phone call from Popal around 6:30 a.m. Popal asked him to open up the shop at Dr. Nick's and to open all of the doors, no matter how cold it was outside, and then hung up. He also told Morrison to clean up anything that looked funny. When Morrison asked why, Popal responded that he had been working on the gas filter in his father's car, and that the car had almost caught fire in the process. T. 386-87. Popal called back twice more, each time requesting that Morrison go and open the shop. After the third call, when he found that Morrison still had not yet left home to attend to the shop, Popal

told him, "Seymour, this is my life. I want you to clean up the shop and do what I ask you to do." T. 387-88.

When Morrison got to the shop, he noticed that his car was still outside, which he had not expected. He found the shop in "bad condition," meaning that it smelled powerfully of a bad odor that he likened to "if you light a stove and put your hands to the stove," but he otherwise found the smell hard to describe. T. 389-90. He also noticed a large drum with something like kerosene oil in it had been moved from where it belonged close to the first lift, which was called "Bay One." [1] He noticed a gas can had been left near the lift as well, and the surrounding floor was covered in water. He also saw that the box of latex gloves was empty, and there were at least 30 pairs of gloves in the trash. T. 394-96.

Morrison observed soot all over Miata's office. A fire extinguisher had been used and moved from its usual spot, and a box of about six cans of Lysol was on the floor. *Id*. There were lids to two unfamiliar aluminum garbage cans. He also noticed that the headrest from Popal's Pontiac Grand Prix was in the garbage. There was a gas can next to the lift, and the lift and surrounding area was wet, like it had been washed down. T. 396-97. Morrison also came across Popal and Frank's jackets while cleaning up. T. 404. Morrison followed Popal's instructions and cleaned the shop, using an air hose to blow the soot out of Miata's office. T. 400-01.

Around 10:00 a.m., Popal and Frank arrived at the shop and spoke to Morrison briefly before departing. They appeared upset and acted the same as they had on Friday night. Then Popal left to go to a seminar on transmissions. T. 401-04. Half an hour later, Popal called Morrison and asked him to call junk yards to find a new seat for his Pontiac; he explained that

---

[1] Morrison later explained that Bay One is the highest lift, which is used for rear-wheel drive cars only. It cannot be used for front-wheel drive cars. T. 398-99. Morrison said he knew Popal's father had three cars, which were all front-wheel drive cars and could not be worked on from Bay One. T. 399-400.

his girlfriend had burnt the original while smoking. When Popal called back around 3:00 p.m. to inquire into Morrison's progress on finding the seat, Morrison said he still had not found one. T. 410-11.

In the early afternoon, Popal and Frank came back to the shop for a hand truck. They were in Frank's car, which looked dirty to Morrison. T. 404-05. Morrison stayed at the shop all day on Saturday. Popal called him again in the evening around 6:30 or 7:00 p.m. and asked why he was still at the shop. Popal told Morrison he should close the shop and go home. After they hung up, Popal showed up at the shop briefly and then left. T. 406-07. After that, Popal called again to see if Morrison was still there. Morrison did not go to the shop on Sunday. T. 407-08.

When Miata came to work on Monday, November 15, 1999, he noticed that Bay One was flooded with water and there was a 55-gallon drum that was missing. He also saw that the room where transmissions were rebuilt was covered in fire extinguisher dust and the gasket sets in the building room were melted. Miata's acetylene torches were also empty. Before Monday, the tanks were three-quarters full. T. 1025-26. He also noticed headrests in the trash that he recognized as from Popal's car. Later, he noticed that a seven-foot long chain and a transmission were missing. T. 1026-27. Miata talked to Morrison, and Morrison said Popal and Frank were working on a car that caught fire. T. 1028. Miata also observed that the shop smelled like something he "never smelled before in [his] lifetime." T. 1030.

When Morrison came to work on Monday, November 15, he saw Popal talking to Miata and Frank in the waiting room. T. 408-09. He also observed Popal's car outside the shop and saw that the passenger side fender was smashed down to the door. He saw the seat had no headrest. T. 414. Morrison motioned to Frank to come over to talk to him, and Frank and Morrison went to the deli. Morrison took Frank to an aisle of the deli and asked him what was

going on. Frank said Popal got himself into a problem, and he told Morrison that Popal took

Haqiqi to upstate New York, beat her up, and threw her out of his car. Frank said the "only

person who can get [Popal] out of this problem is God." T. 412-13. When the two got back to

Dr. Nick's, Popal was gone. T. 414-15.

Later that day, around noon, Frank asked Morrison if he knew of anyone who

could "get rid of" Popal's car. He said they would pay up to $5,000 for the job. T. 414-16.

Frank eventually informed Morrison that Popal had found someone to get rid of the car. T. 419.

On the evening of Tuesday, November 16, Popal called Morrison. T. 416. Popal told Morrison

that the police were coming to Dr. Nick's, and that Morrison ought to tell them that on Friday

night, the two of them had been working on a 929 Mazda in the shop. T. 417-18. Morrison

testified that he lied to the police when he was interviewed, as Popal had asked. T. 418.

On the morning of Wednesday, November 17, Popal came into Dr. Nick's and

asked if the police had indeed come to the shop and interviewed Morrison the night before. T.

418. Morrison told Popal some of what the police told him, and Popal said he would get

Morrison a lawyer if he needed one. T. 418-19.

### 3. *Haqiqi's Disappearance and Ensuing Investigation*

Haqiqi never arrived home as planned on November 12, 1999. T. 941-42. The

next day, Najiba became very worried, as she and Haqiqi were usually in very regular contact

with one another. T. 935-36. Najiba called the Connecticut Police Department and also called

Shafi. T. 942-43. Shafi and Haqiqi called Gatti and asked her to determine whether Haqiqi's car

was still at her apartment in Connecticut; Gatti looked for the car, but could not find it. T. 308-

10, 942. Najiba gave Gatti Popal's phone number, and Gatti called Popal. Gatti asked Popal

where Haqiqi was, and after Popal initially said that he did not know, eventually Popal said that

he and Haqiqi had gotten into a fight and that he had cancelled the date they had scheduled for Friday. T. 310-11.

Najiba was able to access the voice mailbox on Haqiqi's cell phone, where she found two messages from Popal. In one message Popal was upset with Haqiqi, and in the other he was paying her compliments and asking her to meet him. T. 944-45. Najiba called Popal herself many times, and when she reached him on Sunday, Popal said that Haqiqi had cancelled their date. Najiba asked where Haqiqi was, Popal said he did not know, and Najiba threated to give the voicemails to the police. Popal hung up on Najiba. Later, Popal called Najiba and said not to rush in calling the police because Haqiqi would come back. Najiba called the police on Sunday, but she was told to wait another 24 hours. T. 946-48.

The police arrived at Najiba's house on Monday, November 15, 1999. They instructed the family and friends present to look for Haqiqi's car in any of the places she frequented. Azizi and Angione went to the Grand Union parking lot, where they found Haqiqi's car with the gold necklace that Popal had given to her still hanging from the mirror; they immediately contacted the police. T. 232-33, 1429-30. Detective Dorothy Werkmeister responded to this call, and arrived at Haqiqi's home at roughly 3:15 p.m. Detective Werkmeister subsequently examined Haqiqi's car in the Grand Union parking lot, where she observed the gold chain hanging from the mirror, and also a bag of laundry on the seat. T. 342-46.

Also on Monday, November 15, Detective John Malone responded to the Haqiqi residence as a result of the missing person's report that Najiba had filed. He spoke with multiple members of Haqiqi's family and friends who were present there. T. 851-52. Azizi told Malone about accompanying Popal and Haqiqi on dates. T. 853. When Detective Malone returned to the precinct, he called Popal and asked him to report to the precinct. Popal arrived at 7:40 p.m. Popal told Detective Malone that on the morning of Friday, November 12, he had called Haqiqi

in order to apologize about a fight they had had the night before; the pair had subsequently decided to meet that night at 8:00 p.m. T. 812-14. However, Popal said that at 5:00 p.m. Haqiqi had called him and cancelled the date because she was "tired from studying." T. 814-15. Popal said that at 8:05 p.m. on Friday night, he was at Dr. Nick's doing consulting work on a vehicle with Morrison. Popal did not become aware of Haqiqi's disappearance until Sunday, November 14, when Shafi came to Popal's home, and the two men each discovered that the other was seeing Haqiqi. T. 815.

Slightly after midnight on the morning of November 16, Detective Malone arrived at Popal's home, and searched the premises with the consent of Popal and his father. T. 820-21. Detective Malone and his team thoroughly searched a Bonneville in the driveway, but only shined a flashlight into a Pontiac parked across the street. Both cars were registered to Popal. T. 823-24. The next day, on November 16, Malone continued the search along with other officers and members of the canine unit to search for Haqiqi near where her car was found. Detective Malone canvassed the surrounding area. They broadened their search to all of northeast Queens, notified other law enforcement agencies, and alerted the local and national media, which ran stories on Haqiqi's disappearance. T. 825-29.

4.    *Popal's First Arrest*

Popal reported his car, a Pontiac Grand Prix, stolen to the police on November 16, 1999. T. 280. He claimed that it had been stolen while parked in front of his grandfather's house on 98th Street in Woodhaven, Queens. T. 282. Popal also reported the theft to his insurance company, but the claim was ultimately denied because Popal failed to turn in all of the necessary paperwork. T. 1401-10.

Popal was arrested on November 18, 1999 for having falsely reported his vehicle stolen. The arresting officers brought Popal to the precinct to be interviewed about Haqiqi's

disappearance.  Detective Stephen Brown and others interviewed Popal even though his lawyer contacted the precinct and asked them not to speak to his client.  T. 1283-86.  Brown explained they interviewed Popal under the "emergency exception rules of law" where they are allowed to question someone if they believe a person's life is at risk.  Brown said the officers believed that Haqiqi was still alive at that point, and that Popal had information that could be used to find her.  They interviewed Popal for about five hours and took a statement from him.  T. 1286.

Popal told Detective Brown and his team that he began dating Haqiqi in July 1999 after meeting her in an online chat room for Afghanis and then subsequently meeting by chance in public.  T. 1286-87.  Later, Popal brought his family to Haqiqi's house to ask for their permission for him to marry Haqiqi so that the two "could be seen together in public."  The family said they would think about it.  The two would meet on weekends in the Grand Union parking lot at Marathon Parkway and Northern Boulevard, where Haqiqi would leave her car and get into Popal's car.  Popal said he called Haqiqi at her apartment in Connecticut or on her pager on a regular basis.  Popal said that he had argued with Haqiqi over the phone on Thursday, November 11 over "where [Haqiqi] had gone out to eat with some friends."  However, despite the argument, the two agreed to meet on Friday, November 12 in the Grand Union parking lot at roughly 7:00 p.m.  T. 1287-88.

Popal said that he had gone to work at B and A Auto Service on Friday morning, November 12, but he left work early because of a stomach ache and arrived home in Lindenhurst around 1:00 p.m.  At 5:00 p.m., Popal received a call from Haqiqi cancelling that evening's date.  At 7:00 p.m., Popal went to Taco Bell to get some food, and from there he went to Dr. Nick's, arriving at roughly 8:00 p.m., and helped his brother Frank work on a car.  The two worked together for a few hours, and then Popal went home.  T. 1288.

5.    *Subsequent Events and Investigation*

On November 18, Morrison observed Miata answer the phone and give the phone to Frank.  Morrison believed the call was from Frank and Popal's father, who told Frank that Popal had been arrested.  In response, Frank "turn[ed] around and said the bitch deserve[d] what she got."  T. 419-20.  Miata testified the call was from Frank's father, and he also said that Frank screamed that his brother had just been arrested, and he said that "the cunt got just exactly what she deserved."  T. 1036-37.

On November 20, Popal called Morrison and told him that the real reason he needed a new seat for his car was because the police were looking for Haqiqi.  Popal said that he and Haqiqi would have sex in Popal's car while Haqiqi was on her period, and that there was blood in the car because of this, and that was the reason why Popal needed to replace the seat.  T. 421.

On November 20 and 21, 1999, Detective Richard McCabe went to Dr. Nick's with the Crime Scene Unit and recovered property including a bloody drain pipe from the bathroom, a fire extinguisher, a gas can, Lysol, and scissors.  They also took industrial cleaner.  T. 1181-82.

On November 23, 1999, Detective Malone went to Dr. Nick's to recover fluid samples from Bay One, and he collected three small containers of fluid from underneath the lift that he sent to the lab for analysis.  T. 830-31; 1125-27.  Later, on December 17, Detective Thomas Luberto drained all of the fluid from underneath Bay One into a 55-gallon drum.  During this process, he discovered what appeared to be strands of hair.  He called the Crime Scene Unit for more help, and they recovered more hair and packaged the hair as evidence.  T. 661-66.  A forensic scientist for the police department testified that the hair samples recovered from Bay One matched samples recovered from Haqiqi's apartment, meaning they could have

come from the same source.  T. 721-30.  Additionally, DNA mitochondrial testing revealed that hair samples taken from Najiba had the same mitochondrial DNA as those recovered from Bay One, which would be consistent with those samples having come from Haqiqi.  T. 1387-88.

The next day, Saturday, December 18, 1999, Morrison observed Popal and Miata speaking together inside the shop at Dr. Nick's; the two men "were really, really close and they were crying."  Miata asked Popal, "why," and Popal told him, "she was evil."  T. 423-24.  Popal took Morrison aside and said, "I have something to say to you . . . whatever you do, do it the right way . . . . [If] I don't hear from you, I don't see you, take care of yourself."  At that point, Popal left and Morrison called the police.  T. 424.  Miata recalled the same conversation with Popal, and Miata testified that he told Popal, "everybody knows, including the police, what you did.  We all know that you murdered the girl."  T. 1038.  Miata told Popal, "let's get this thing over with, let's do the right thing."  At that point, a customer came in, so Miata went to talk to the customer.  When he came back, Popal was gone.  T. 1039-40.

6.      *Popal's Arrest for Haqiqi's Murder*

On August 2, 2002, Detective McCabe and other officers went to California to arrest Popal for Haqiqi's murder.  They went to the transmission shop where Popal was working and placed him under arrest.  They also went to another transmission shop in California and arrested Frank, also for Haqiqi's murder.  McCabe went to interview Popal, who told him, "let my brother and father go.  They have nothing to do with this.  They didn't know her.  You can't judge me.  Only God can judge me."  T. 1184-89.  McCabe reminded Popal that they were not allowed to discuss the case because Popal had a lawyer.  In spite of this, Popal made comments to McCabe referring to "Sami" as the "victim."  Popal said that they were engaged because they were holding hands, and that "it was custom from his country Afghanistan that she would be considered a whore for what she did and that for the way she lived and everything and he would

be considered a hero for this." T. 1194-95. Popal said to McCabe, "I wish we were in New York right now. I'd borrow your gun and kill the family." He said the case was "circumstantial" because "[y]ou don't have a body." Popal also suggested that the police should look into Shafi. T. 1196.

B.     *Popal's Defense*

At trial, the defense presented testimony from one witness, Stuart Tarshis, Popal's former attorney. Tarshis testified that on November 18, 1999, he received a call from Popal's father telling him that Popal had been arrested. Tarshis called the precinct and told them not to question Popal until he arrived, but the sergeant told Tarshis that Popal was in custody but not under arrest, and he was taken to the precinct to be questioned about the disappearance of a young woman. The sergeant told Tarshis that if he came to the precinct, he could not be present with his client during the questioning and the police intended to question Popal in Tarshis's absence. T. 1516-18.

When Tarshis arrived at the precinct, he was not permitted to speak to his client. He requested that they videotape the interview, and the officers said no. Tarshis expressed his views that the questioning was inappropriate and went home. He called the precinct to check on Popal and reiterated his view that the questioning was inappropriate. Around 4:45 a.m. the next morning, Tarshis received a call from the district attorney's office telling him that Popal was being charged with falsely reporting an incident. T. 1519-21.

C.     *Subsequent Procedural History*

1.     *Popal's Direct Appeal*

Popal appealed to the Second Department of the New York Appellate Division and raised four claims. He argued that (1) the trial court erred in denying his motion to dismiss for lack of jurisdiction; (2) the trial court improperly admitted hearsay testimony; (3) the verdict

was not supported by sufficient evidence and was against the weight of the evidence; and (4) he was denied effective assistance of counsel in various respects. *See* Pet. App. Br. dated May 22, 2008, ECF No. 6, at 1-88. Popal also filed a *pro se* supplemental brief raising additional claims, which were: prosecutorial misconduct before the grand jury, ineffective assistance of counsel, error in denying suppression of statements when Popal was denied his right to counsel, improper limitation of cross-examination of a government witness, preclusion of questioning an attorney about the "emergency doctrine," and improper summation by the prosecutor. *See* Pet. App. Br. dated Aug. 22, 2008, ECF No. 6, at 90-147.

The Second Department affirmed Popal's conviction on May 19, 2009, holding as follows:

- "The defendant, after consulting with his trial counsel, knowingly and intelligently waived his right to have the jury consider and determine the issue of whether Queens County was the proper venue for trial;"

- The defendant properly preserved his contention that the trial court erred in denying his motions to dismiss the indictment on the ground of improper venue, but the government proved that "conduct occurred in Queens County sufficient to establish either an element of each offense of which the defendant was convicted or a conspiracy to commit each such offense." Accordingly, the trial court properly denied the motion to dismiss the indictment on this ground;

- The evidence was legally sufficient to establish Popal's guilt beyond a reasonable doubt, and the verdict was not against the weight of the evidence;

- Popal was not denied the effective assistance of counsel; and
- Popal's additional arguments, including those in his supplemental *pro se* brief, were without merit.

*People v. Popal*, 879 N.Y.S.2d 185, 185 (2d Dep't 2009) (citations omitted).

Judge Pigott of the New York Court of Appeals denied Popal's request for leave to appeal on August 7, 2009, *People v. Popal*, 13 N.Y.3d 748 (2009), and also denied his request for reconsideration of that denial on October 28, 2009. 13 N.Y.3d 838 (2009). The United

States Supreme Court denied Popal's petition for a writ of certiorari on January 25, 2010. *Popal v. New York*, 559 U.S. 909 (2010).

2. *Popal's Collateral Attacks*

Popal made a *pro se* motion for DNA testing pursuant to § 440.30 of the New York Criminal Procedure Law, arguing that DNA testing should be conducted on the heart pendant necklace found in Haqiqi's car. Pet. Mot. for DNA Testing, Jan. 25, 2010, ECF No. 6-2, at 18-22. The Supreme Court denied the request on February 7, 2011. Bresnahan Aff. ¶¶ 24-25; *People v. Popal*, No. 2186-02 (Sup. Ct. Queens Cnty., Feb. 7, 2011), ECF No. 6-2, at 32-34. The Second Department affirmed the denial on May 28, 2014, holding that the Supreme Court properly denied the motion "since the defendant failed to show that there was a reasonable probability that the verdict . . . would have been more favorable to him had DNA tests been performed." *People v. Popal*, 986 N.Y.S.2d 341 (2014). Judge Pigott of the New York Court of Appeals denied Popal's request for leave to appeal on August 25, 2014. *People v. Popal*, 23 N.Y.3d 1066 (2014).

Popal also moved to vacate his conviction pursuant to § 440.10 based on claims of ineffective assistance of counsel, actual innocence, newly discovered evidence that proved his innocence, and a pattern of prosecutorial misconduct. Bresnahan Aff. ¶ 30, Pet. § 440.10 Mot., ECF No. 6-3, at 120-44. The Supreme Court denied the motion on May 14, 2012. Bresnahan Aff. ¶ 41. The Appellate Division denied leave to appeal on October 11, 2012. *Id.* at ¶ 48.

Popal's petition for habeas relief followed on March 6, 2015.

## DISCUSSION

Popal's petition for habeas relief raises the following claims, all of which have been raised previously in his direct appeal or his collateral attacks on his conviction: (1) his trial in Queens County violated the Sixth Amendment's Vicinage Clause; (2) he received ineffective

16

assistance of counsel; (3) the state court applied *Miranda* law unreasonably; (4) his

Confrontation Clause rights were violated; (5) the evidence was legally insufficient to prove his

guilt; (6) the state court unreasonably rejected his claim based on newly discovered evidence; (7)

the state courts unreasonably rejected his actual innocence claim; and (8) he was denied his due

process rights because of the prosecutor's improper arguments in summation.

A.      *Standard of Review*

1.      *Exhaustion and Procedural Default*

The exhaustion requirement, codified at 28 U.S.C. § 2254(b)-(c), obligates a

federal habeas petitioner to exhaust state judicial remedies before seeking relief from a federal

court.  To exhaust state remedies, a petitioner must "fairly present" his federal constitutional

claims to the highest state court with jurisdiction over them.  *Duncan v. Henry*, 513 U.S. 364,

365 (1995) (quotation marks and alteration omitted); *see also Daye v. Attorney General of New

York*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*).  This requirement, which "springs primarily

from considerations of comity" between the federal and state systems, *id*. at 191, affords the state

courts "the opportunity to pass upon and correct alleged violations of its prisoners' federal

rights."  *Duncan*, 513 U.S. at 365 (quotation marks and citation omitted).

As part of this requirement, a federal habeas court may not "review a claim

rejected by a state court if the decision of the state court rests on a state law ground that is

independent of the federal question and adequate to support the judgment."  *Walker v. Martin*,

562 U.S. 307, 315 (2011) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (quotation

marks and citation omitted)).  Without this doctrine, "habeas would offer state prisoners . . . a

means to undermine the State's interest in enforcing its laws."  *Coleman*, 501 U.S. at 730-31.  A

state procedural default qualifies as an adequate and independent ground and will preclude

federal habeas review unless a petitioner can show cause for the default and prejudice

attributable thereto, or that a failure to consider the federal claim will result in a fundamental miscarriage of justice. *Harris v. Reed*, 489 U.S. 255, 262 (1989) (quotation marks and citations omitted); *accord Coleman*, 501 U.S. at 750.

Unless otherwise noted in this opinion, respondent does not contest that Popal exhausted the claims raised in his petition.

2. *AEDPA Deference to State Court Decisions on the Merits*

If a timely claim is exhausted and not procedurally defaulted, a habeas court will consider the merits of the claim under the standard set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under that standard, habeas relief may be granted only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). *See also Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") (quotations omitted); *Rodriguez v. Miller*, 537 F.3d 102, 109-10 (2d Cir. 2007) ("[A] federal court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.") (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties

of the United States." *See Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002); *see also Downs v. Lape*, 657 F.3d 97, 105 (2d Cir. 2011) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (quotation marks and citation omitted). Additionally, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue only where petitioner can show that the error deprived her of a fundamentally fair trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983).

3.     *Review of Harmless Error*

On habeas review, I use the standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), to decide whether a state court's determination that a constitutional error was harmless was correct. *See McBee v. Burge*, 644 F. Supp. 2d 270, 284 (E.D.N.Y. 2009), *aff'd*, 395 F. App'x 762, 763 (2d Cir. 2010). The *Brecht* standard allows me to grant relief only if the petitioner establishes that "the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir. 1996) (quoting *Brecht*, 507 U.S. at 638 (additional citation omitted)).

The Supreme Court has listed five factors to determine whether a trial court's decision to exclude evidence constituted harmless error: "(1) the overall strength of the prosecution's case; (2) the importance of the witness's testimony; (3) whether the testimony was cumulative; (4) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; and (5) the extent of cross-examination otherwise permitted." *Alvarez v. Ercole*, 763 F.3d 223, 233 (2d Cir. 2014) (quoting *Delaware v. Arsdall*, 475 U.S. 673, 684 (1986) (internal quotations omitted)).

B.    *Popal's Claims for Relief*

1.    *The Sufficiency of the Evidence*

Popal claims that the evidence at this trial was insufficient to prove his guilt beyond a reasonable doubt.  To overturn a conviction based on insufficiency of the evidence, a petitioner must establish that, "'viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (additional citation omitted).  "A defendant challenging the sufficiency of the evidence supporting his conviction bears a heavy burden . . . ."  *Dixon*, 293 F.3d at 81 (citation omitted).

Viewing the facts in the light most favorable to the prosecution, the proof of Popal's guilt was sufficient.  To be found guilty of second-degree murder, the jury was required to find that with the intent to kill Haqiqi, Popal killed her.  N.Y. Penal Law § 125.25.  The evidence at trial proved that Haqiqi intended to meet Popal at their usual meeting place, the Grand Union parking lot in Queens, on November 12, 1999.  Popal and Haqiqi had dated, and Popal was possessive and aggressive towards Haqiqi; he was angry that she was dating someone else and that she wanted to break up with him.  Haqiqi never arrived home after going to meet Popal, and her car was found at the Grand Union parking lot with a necklace that Popal gave her hanging on the rearview mirror.  Haqiqi only put the necklace on the rearview mirror when she saw Popal.

Testimony established that Popal called his brother Frank at Dr. Nick's around 7:30 p.m. on the day of the murder, and then Popal and Frank worked late that night to burn something very large at the transmission shop — then worked even harder to cover up their actions.  Popal made incriminating statements to his friends, his co-workers, and the police.  He

20

gave conflicting statements about why he needed a replacement for the headrest of his car, including that Haqiqi's blood would be found on it. He told Morrison to lie to the police.

Haqiqi's body was never found. Instead, her hair was found in the catch basin of Dr. Nick's. Taken together, these facts are more than enough for a reasonable jury to find Popal guilty of Haqiqi's murder.

### 2. *Popal's Sixth Amendment Vicinage Clause Claim*

The Vicinage Clause of the Sixth Amendment provides that in criminal prosecutions, "the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have previously been ascertained by law . . . ." U.S. Const. amend. VI. Popal contends that his Sixth Amendment rights were violated when the Supreme Court decided that Queens County was a proper venue for his trial. *See* Pet. Br. at 18-27. Petitioner's argument, which he raised on direct appeal, is that there is no reliable proof that he was in Queens at any point during Haqiqi's murder, and there is no proof that Haqiqi was killed in Queens at all. *See id.* at 21-22. He argues that the prosecution's theory of the case that Popal met Haqiqi at a parking lot just on the Queens side of the Queens-Nassau county border, killed her, and then drove to Dr. Nick's transmission in Nassau County to dispose of the body lacks any reliable proof that Popal was in Queens at any point during the murder. *Id.*

First, I note that the appellate court's determination that the government proved that "conduct occurred in Queens County sufficient to establish either an element of each offense of which the defendant was convicted or a conspiracy to commit each such offense," *People v. Popal*, 879 N.Y.S.2d 185, 185 (2d Dep't 2009), is entitled to AEDPA deference. Accordingly, it may be overturned only upon a finding that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  As the Second Circuit has noted, the Supreme Court has not decided whether the Vicinage Clause applies to the states.  *Carvajal v. Artus*, 633 F.3d 95, 110 (2d Cir. 2011) (quotations omitted).  Therefore, the Second Department's determination was not an unreasonable application of Supreme Court precedent.

Additionally, to the extent that Popal's argument is based on rights guaranteed under New York law, his claim also fails.  Federal habeas review is available only for rights guaranteed by the federal constitution.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.").

### 3. *Popal's Ineffective Assistance Claims*

To establish a claim of ineffective assistance of counsel under the federal constitution, Popal must show that (1) his counsel supplied deficient representation, and (2) he suffered prejudice as a result of that deficient performance.  *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  To establish deficient performance, a defendant must show that "counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"  *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687).  To establish prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

Under federal habeas review, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."  *Harrington*, 562 U.S. at 105.  On habeas review, "the question is not whether counsel's actions were reasonable.  The

22

question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

There is no argument that Popal failed to exhaust any of his ineffective assistance of counsel claims. Therefore, I will evaluate Popal's claims under the deferential standard of § 2254, as stated in *Harrington*. Popal contends that his counsel failed to: (1) introduce particular evidence, including evidence of a telephone call that Frank allegedly received at Dr. Nick's on the night of the murder; (2) request a jury charge on jurisdiction; (3) object to hearsay testimony from Miata; and (4) object to testimony concerning Haqiqi's voicemail messages that Najiba listened to. He further claims that (5) his counsel made inappropriate remarks about his mother during summation; and (6) the cumulative effect of counsel's errors amounted to ineffective assistance.

The Second Department's decision finding that Popal did not receive ineffective assistance of counsel was not unreasonable. Indeed, I agree with its determination. Popal argues that his trial counsel failed to introduce evidence concerning the call that Frank received at Dr. Nick's on the night of the murder that would show: (1) Frank received a call that same evening from his wife, who was checking up on him because of past infidelity; (2) the word "Haqiqi" in the Dari language, spoken in Afghanistan, could mean "real" or "true," and the word "kee-kee" means "who"; and (3) the location of an air compressor in Dr. Nick's would have made Miata and Morrison unable to hear Frank's phone conversation. Popal also argues that his counsel failed to introduce evidence that would show (4) there is no catch basin in Dr. Nick's garage from which hair could have been recovered. Pet. Br. at 30-31.

As to the evidence concerning the phone call from Frank's wife, Popal has no legitimate argument that it would contradict evidence that shows Frank also received a phone call from Popal that night, and that it was Popal's phone call that caused Frank to exclaim,

"Haqiqi."  *See Hamilton v. Lee*, No. 13-CV-4336, 2015 WL 1402316, at *15 (E.D.N.Y. Mar. 27, 2015) ("To demonstrate that an attorney was ineffective because he failed to explore a particular issue or present certain evidence, a petitioner must demonstrate the absence of strategic or other legitimate explanations for defense counsel's failure.").  As respondent points out, phone records show that Popal called Frank at Dr. Nick's that night, and Morrison and Miata both testified it was that phone call that upset Frank.  *See* T. 377-78, 1020-22, 1149-53.

   As to Popal's arguments about the failure to introduce evidence of the definition of "Haqiqi," the location of the air compressor, or the existence of a catch basin, he has not shown that the failure to introduce this evidence was prejudicial to his case.  As the New York Supreme Court pointed out when it denied Popal's § 440 motion, "[t]here was testimony from numerous witnesses, including the owner of the shop, that describe[d] the catch basin, and the basin was depicted in crime scene photographs introduced into evidence at the trial."  *People v. Popal*, No. 2186-02 (Sup. Ct. Queens Cnty. May 14, 2012), ECF No. 6-6, at 4 (ECF page no. 26).  All of these decisions reasonably amounted to trial strategy.  Moreover, as explained below, there was more than sufficient evidence for a reasonable jury to find Popal guilty of Haqiqi's murder and none of these decisions, even if made in error, would rise to the level of showing prejudice under *Strickland*.

   Popal argues that during summation, his counsel inappropriately said, "[I]f I in any way acted in a way that was uncomfortable for you, I apologize.  My mother was a pathological liar, and it just gets me crazy when people lie in my face."  Pet. Br. at 44-45 (quoting T. 1556).  The statement was made during counsel's introductory remarks at summation, which also including the statement, "[m]y father told me don't talk to me with the mouth, show me, show me your case."  T. 1558.  Taken together, these remarks, though odd, were the product of a reasonable defense strategy, that is, the theme that the government's

witnesses were lying and the evidence did not show that Popal was guilty. In any event, even if they were evidence of deficient performance, they do not come close to showing prejudice under *Strickland*. *See Carty v. Artuz*, No. 03-MISC-0066 (JBW), 2003 WL 22964577, at *6 (E.D.N.Y. Nov. 11, 2003) (finding that "[t]rial counsel's summation did not 'so undermine[ ] the proper functioning of the adversarial process [such] that the trial cannot be relied on as having produced a just result.'") (quoting *Strickland*, 466 U.S. at 686).

Popal further claims that his counsel failed to request a jury charge regarding venue, which he says would have provided a separate basis for his acquittal of the murder. *See* Pet. Br. at 38. As respondent points out, the trial record indicates that Popal's counsel made the decision not to request a venue charge after consulting with Popal. Resp. Br. at 74-75. Indeed, the record is as follows:

> THE COURT: Counsel, you just said you do not want a charge as to jurisdiction?
>
> MR. SLOVIS: Yes.
>
> MR. WEINRIB: Your Honor, this was an extensively litigated issue. I know we just had the equivalent of a side bar. I would just ask counsel to place his reasons on the record and have his client consent.
>
> THE COURT: [Slovis] had just spoken to his client. I imagine he is following his client's direction; is that correct?
>
> MR. SLOVIS: Yeah. His client quote unquote says he wants this nonsense over with.
> . . . .
>
> MR. SLOVIS: He can't afford Mr. Slovis again. We are going to waive jurisdiction on this issue.
>
> THE COURT: Is that your decision, Mr. Popal?
>
> THE DEFENDANT: Yes, it is.

T. 1546-47. This issue was raised in the Second Department, which did not find counsel's decision or advice in this regard to be inappropriate and found no defect in Popal's waiver of this issue. The Second Department's decision was not unreasonable. Even if the failure to request this instruction were error, there was no prejudice because the evidence adduced at trial was sufficient for a reasonable jury to find the crime was committed in Queens County.

Popal's final claim is that the cumulative effect of his counsel's errors amounted to ineffective assistance. This claim is procedurally defaulted, as it was not raised in any of his state court proceedings. Even if it is considered on the merits, the claim is meritless, as I have already explained that in my view, his counsel was not ineffective.

4. *Popal's Statements to the Police*

Popal argues that the trial court impermissibly admitted his statements to the police made on November 18, 1999, which violated his Fifth Amendment rights as expressed in *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), *New York v. Quarles*, 467 U.S. 649, 658-59 (1984), and *Dickerson v. United States*, 530 U.S. 428, 435 (2000). Popal raised this argument in his supplemental *pro se* brief to the Second Department, and the Second Department ruled on the question when it decided that Popal's remaining contentions, including those raised in his supplemental brief, were without merit. *Popal*, 879 N.Y.S.2d at 185.

Generally, a suspect is entitled to *Miranda* warnings only if he or she is interrogated while "in custody." *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) (citing *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)). Here, there is no dispute that Popal was subject to custodial interrogation, thus triggering his *Miranda* rights. *See* Resp. Br. at 97. Respondent contends that the statements – made to investigating officers six days after Haqiqi was reported missing – were properly admitted pursuant to the "public safety" exception to *Miranda* as articulated in *Quarles*, where arresting officers may question a defendant when

"necessary to secure their own safety or the safety of the public." *See United States v. Newton*, 369 F.3d 659, 677 (2d Cir. 2004) (quoting *Quarles*, 467 U.S. at 658-59) (internal quotation marks omitted).

Popal's argues that the safety of the public was not at risk sufficient to trigger the public safety exception. He points out that although the police were interested in the whereabouts of Haqiqi, they had no indication of a threat to public safety, such as the presence of a gun in a public place, that would justify questioning Popal in the absence of reading him his *Miranda* rights. *See Newton*, 369 F.3d at 677-78 (questioning related to location of a firearm); *see also United States v. Ferguson*, 702 F.3d 89, 94 (2d Cir. 2012) (*Quarles* exception triggered where police were concerned about location of a gun in a public place). In this regard, I agree with Popal that the Second Department's determination that the admission of Popal's statements was not a violation of *Miranda* and was an unreasonable interpretation of Supreme Court precedent. Respondent's argument, if accepted, would operate to essentially suspend the obligation to administer *Miranda* warnings in all missing person cases until the missing person was found.

However, any error in admitting Popal's statements was harmless in light of the overwhelming evidence of Popal's guilt. *See Fry*, 551 U.S. at 121-22; *Brecht*, 507 U.S. at 638. Popal's statements included information that was duplicative of other evidence, such as that he saw Haqiqi mostly on weekends and met her in the Grand Union parking lot, and that, although they argued, they agreed to meet on Friday, November 12, at the parking lot. *See* T. 1287-88. For example, Azizi already testified that Popal and Haqiqi would meet in the parking lot, and Najiba testified about voicemails that Popal left Haqiqi on November 11. *See* T. 225-26, 943-46. Additionally, it was not until Popal was arrested in 2002 for Haqiqi's murder that he made

incriminating statements, including the statement to the officer that, if he were in New York, he would "borrow [the officer's] gun and kill [Haqiqi's] family." T. 1196.

5. *Popal's Confrontation Clause Claims*

Popal argues that his Sixth Amendment Confrontation Clause rights were violated when the trial court permitted Morrison and Miata to testify to statements that Frank made to them that Popal had gotten "himself into a problem" and took Haqiqi to "upstate New York and beat her up and thr[e]w her out of the car," and also that after learning of Popal's arrest, Frank said that Haqiqi "got what she deserved." Pet. Br. at 54; *see also* T. 413, 1037. Popal also argues that the trial court impermissibly limited the cross-examination of Dr. Carmine Ambrosi, the medical examiner, concerning decomposition of charred bodies. Pet. Br. at 54-55.

As stated by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Confrontation Clause guarantees that out-of-court testimonial statements are inadmissible against a defendant unless (1) the declarant is unavailable, and (2) the defendant had a prior opportunity for cross-examination. *See Davis v. Washington*, 547 U.S. 813, 827-28 (2006). Popal contends that his rights were violated when the hearsay statements were admitted against him. Respondent argues first that the statements concerning what Frank said to Morrison and Miata were not testimonial, and second that they were not hearsay because they were not offered for their truth. Respondent further argues that the statement that Frank said Haqiqi "got what she deserved" was admitted to show Frank's state of mind, which was relevant to the nature of the conspiracy between Popal and him. Resp. Br. at 109.

I agree that the trial court's conclusion that the statements were not hearsay was not an unreasonable application of Supreme Court precedent. Frank's statement that Popal took Haqiqi upstate, beat her up, and threw her out of his car is a classic example of non-hearsay, as it was not offered to prove that Popal did any of those things. Although I may disagree that the

Frank's statement that Haqiqi got what she deserved was similarly offered to show his state of mind, that evidentiary ruling is not egregious enough to implicate Popal's due process rights, as "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *See Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983). "Rather, the writ would issue only where petitioner can show that the error deprived her of a fundamentally fair trial." *Id.* The Due Process Clause of the Fourteenth Amendment is violated where "the evidence in question was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (quotations omitted).

      As to Popal's argument regarding the cross-examination of the medical examiner, the Supreme Court has clearly established a criminal defendant's Sixth Amendment right to "a meaningful opportunity to cross-examine witnesses against him." *Alvarez*, 763 F.3d at 229-30 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)). However, "[t]he Confrontation Clause does not . . . guarantee unfettered cross-examination." *Alvarez*, 763 F.3d at 230 (citing *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)). Instead, a trial court retains broad discretion to impose reasonable limits on cross-examination. *Id.* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1985) (additional citation omitted). On habeas review of a claim for denial of Confrontation Clause rights, the Second Circuit has said:

> Combining the standard for restricting cross-examination with the AEDPA standard, in order to grant a habeas petition we would have to conclude not only that the trial court abused its broad discretion by precluding cross-examination but also that the state appellate court could not reasonably have determined that the evidence would have been excludable had the trial court properly applied standard rules of evidence.

*Id.* (internal quotations and alterations omitted). In this case, there is no indication that the trial court's decision was so unreasonable as to amount to a constitutional violation. The

Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20.  Accordingly, habeas relief for Popal's Confrontation Clause claims is denied.

6.  *Popal's Additional Claims*

Popal's claims of actual innocence and that the state courts unreasonably rejected his newly discovered evidence are based on the same arguments discussed above with respect to Popal's ineffective assistance of counsel claims.  For the same reasons that I rejected his claim that his counsel was ineffective for failing to introduce that evidence, I reject his claim that the evidence would have shown his innocence.  Popal further seeks to introduce new evidence that would show additional support for his claim that no drain existed under the lifts at Dr. Nick's, and that contrary to Miata's testimony, Dr. Nick's had been fined several times for operating without a license.  I am not persuaded that the failure to introduce this evidence made a meaningful difference in Popal's trial.

Finally, Popal's argument based on what he claims was the prosecution's improper characterization of the evidence at summation is denied.  Popal has shown no prejudice and therefore no violation of his due process rights as a result of these remarks.

CONCLUSION

For the reasons stated above, Popal's petition is denied.  Because he has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated: September 11, 2015
       Brooklyn, New York